**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

---

CARL ALEXANDER COHEN,

               Plaintiff,

v.

BOSTON SCIENTIFIC CORPORATION;
REPUBLIC SURGICAL, INC.;
MEDWORX, INC.;
ALEXANDRE R. MOUCHATI;
DOES 1-20, inclusive; and
DOE ENTITIES 11-20, inclusive,

               Defendants.

Civil Action No. 1:20-cv-00943

BOSTON SCIENTIFIC CORPORATION'S MOTION TO EXCLUDE THE TESTIMONY OF JOHN JARRELL

---

TO:    THE CLERK OF COURT AND ALL PARTIES OF RECORD:

**MOTION**

Under Rule 702 of the Federal Rules of Evidence, Defendant Boston Scientific Corporation moves the Court to exclude the testimony of Plaintiff's expert John Jarrell. For and in support of its Motion to Exclude, Boston Scientific submits the below memorandum of law and any oral argument presented to this Court. Pursuant to rule 7.1(c), Boston Scientific certifies to the Court that it made a good-faith attempt to obtain a concurrence from Plaintiff for the relief sought, and a concurrence was not obtained.

**MEMORANDUM OF LAW**

Plaintiff has no competent evidence that the Boston Scientific GreenLight Laser System used in his surgery was defective or caused his injuries. There is not a single healthcare provider, including Plaintiff's *own* medical expert, or any medical record that supports his claim. So without any evidence, Plaintiff has turned to jack-of-all-trades expert John Jarrell, Ph.D., P.E., to attempt to impugn the laser system's eminently reasonable design and to establish injury causation.

But for the expert-testimony standard to mean anything, this Court should exclude Jarrell from offering opinions about the GreenLight Laser System. Jarrell has no experience or background with laser systems. He has never researched, written on, or worked on laser systems. His expertise is comprised solely of on-the-job training *in this litigation*, which is plainly insufficient to qualify him to testify on product defect. Nor can he render medical-causation testimony given that he has no medical training. Unsurprisingly in light of his lack of experience, Jarrell's methodology and factual foundation are wholly unreliable—so flawed that the Court must exercise its gatekeeping duties to exclude this testimony from a jury.

## Background

### I.    GreenLight Laser System and case background[1]

The GreenLight Laser System is designed to vaporize and coagulate soft tissue using a green laser light, and is composed of both the XPS console and the MoXy fiber. (Ex. A, GreenLight XPS Operator's Manual 1.) The console generates the laser light (up to 180 watts), and the fiber transmits the light to the patient's tissue. (*Id.*) One use of the device is for photoselective vaporization of the prostate (PVP), a procedure to treat benign prostatic hyperplasia (BPH) by removing enlarged prostate tissue. (Ex. B, Lamba Dep. 15:2–17:14.)

---

[1] For a more detailed factual background, Boston Scientific refers to its Motion for Summary Judgment.

In 2016, Plaintiff went to urologist Dr. Lamba to get treatment for symptoms of BPH. Plaintiff underwent a PVP procedure in July 2017. (Ex. B, Lamba Dep. 14:17–16:11.) Prior to surgery, it is Dr. Lamba's practice to place saline in a warmer set at 103°F. (*Id.* at 81:9–24.) She then uses the fluid for irrigation purposes during the surgery—using saline to move tissue, flush away blood, flushing away debris. (*Id.* at 115:25–116:13, 117:10–18.) During Plaintiff's procedure, Dr. Lamba used the laser system to vaporize unwanted bladder tissue. (Ex. C, July 27, 2017, Operative Note 1-2.) The surgery was uneventful until Dr. Lamba could not successfully remove a nodule. She tried to use the tip of the MoXy fiber, but its cap fell off. (*Id.* at 2.) She retrieved the cap and completed the procedure by performing a transurethral resection of the prostate ("TURP")—using a bipolar loop (an instrument that has electrodes at the end of it) to resect tissue. (*Id.*)

Plaintiff "tolerated the procedure well with no complications." (Ex. C, July 27, 2017, Operative Note 2.) Dr. Lamba examined the ureteral orifices and they "were away from any vaporization or resection"; she did not observe any vaporization of the bladder or ureteral orifices. (*Id.*) Following surgery, Dr. Lamba ordered a renal ultrasound and labs, neither of which indicated anything abnormal occurred with the laser. (Ex. B, Lamba Dep. 72:4–73:6.) But a few days after surgery, Plaintiff began to experience complications which were later determined to be related to diffuse thermal bladder injuries. Following these injuries, Dr. Lamba had concerns that the saline used during Plaintiff's surgery may have been improperly overheated by being placed in a blanket warmer, and that this overheated saline caused Plaintiff's injuries. (*Id.* at 141:20–143:3.)

## II.   Jarrell's qualifications and background

Plaintiff retained Jarrell to testify on product defect and medical causation. Missing from Jarrell's education and experience as a biomedical engineer, however, is any experience with laser

2

systems. For example, Jarrell:

- has nothing in his CV relating to laser systems;

- has never been involved with the design or development of laser systems;

- appears to have never used, or been involved, in anything relating to laser systems.

(Ex. D, Jarrell Dep. 214:8–220:1) Simply put, Jarrell has no experience with laser systems.

### III.   Jarrell's analysis and opinions

According to his report, Jarrell's "analysis" consisted of performing calculations to show the extent to which a 180-watt laser like the GreenLight XPS laser console could increase the temperature of saline irrigation fluid used during the procedure beyond its intended 40°C starting temperature. He performed these calculations under two scenarios: (1) adequate tissue vaporization occurs; and (2) tissue does not readily vaporize (as in Plaintiff's surgery). (Ex. E, Jarrell Rep. 22–26.) Jarrell concluded that under the second scenario, if one assumes all the laser energy is converted to heat, the laser could increase saline irrigation fluid temperature to 54.35°C. (*Id.* at 22–23.) He then notes that "according to published scientific literature dealing with the elevated temperature of bladder irrigants, the temperature of the incoming saline is expected to drop 2 to 2.5°C in the process of reaching the bladder," so he therefore subtracted 2-2.5 degrees from his calculation to opine that the overall resulting temperature in Plaintiff's surgery would have been 51.85–52.35°C. (*Id.*) Jarrell performed no testing to assess or confirm his theory—i.e., that the GreenLight Laser System could heat saline to 51.85–52.35°C during a surgery. At his deposition, Jarrell modified or clarified his theory, in part, asserting that the laser does not directly heat the saline, but instead heats the tissue, which in turn heats the solution, which in turn burns the tissue. (Ex. D, Jarrell Dep. 243:16–244:22.)

Based on his theory and calculations, Jarrell opines: (1) that the GreenLight XPS laser system was defectively designed; (2) the design defect caused Plaintiff's injuries; and (3) Boston Scientific failed to adequately warn of this danger and this too caused Plaintiff's injuries.

**Law and Argument**

**I.    Jarrell's design-defect opinion is inadmissible.**

**A.  Jarrell is unqualified to testify on the GreenLight Laser System.**

To be qualified to give expert opinion testimony, a witness "must have sufficient background and possess specialized knowledge that 'will assist the trier of fact to understand the evidence or to determine a fact in issue." *Carrier v. Am. Bankers Life Assur. Co. of Fla.*, No. CIV. 05-CV-430-JD, 2007 WL 3124653, at *1 (D.N.H. Oct. 25, 2007) (quotation marks omitted).

Jarrell is a laser-system novice who lacks any experience with laser systems outside of *this* litigation. He has never worked with a medical-device manufacturer on laser systems; consulted with a government agency on laser systems; been involved with the development or design of laser systems; published or written anything on laser systems; taught anything on laser systems; or even offered an expert opinion on laser systems. (Ex. D, Jarrell Dep. 214:8–220:1). None of Jarrell's society affiliations, certifications, awards, research publications, abstracts, industry publications, bulletins, seminars, or patents has anything to do with surgical lasers. (*See* Ex. F, Jarrell CV.) He's written a book too, but that does not have anything to do with surgical lasers either. Based on his CV, report, and deposition, this case is Jarrell's first foray into laser systems.

Jarrell seems to be an experienced biomedical engineer. He just does not have experience that qualifies him to testify about the product at issue in this case—a problem that has tripped him up before in medical-device litigation. *See, e.g.*, *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 439 (S.D.N.Y. 2016) ("Although Dr. Jarrell seems to be an accomplished and experienced

4

biomedical engineer—he has experience in certain biomaterials and implants—he has no previous experience with IUDs or hormonal contraception like Mirena."). Indeed, courts routinely hold that possessing qualifications as to some medical devices does not make one an expert as to all medical devices; the expert must have experience with the class of devices about which the expert seeks to offer testimony. *See, e.g.*, *McCorvey v. Baxter Healthcare Corp.*, No. 99-1250-CIV, 2001 WL 36393134, at *4 (S.D. Fla. Sept. 30, 2001) (excluding as unqualified a mechanical engineer's catheter opinions because he had never worked with, researched, or written about catheters), *aff'd in part, rev'd in part on other grounds*, 298 F.3d 1253 (11th Cir. 2002). Jarrell has no experience with, and is unqualified to testify about, laser systems.

### B. Jarrell's design-defect opinions lack reliability.

The proponent of expert testimony must prove its reliability. *Maselli v. Durden*, No. 19-CV-1248-AJ, 2022 WL 18542265, at *3 (D.N.H. May 12, 2022). "Reliability is a flexible inquiry," and courts consider factors such as "whether the expert's methodology has been objectively tested; whether it has been subjected to peer review and publication; the technique's . . . error rate; and whether the expert's technique has been generally accepted within the relevant industry." *Lawes v. CSA Architects & Eng'rs LLP*, 963 F.3d 72, 98 (1st Cir. 2020) (citation omitted).

Although the focus is on methodology, expert testimony must be "based on sufficient facts or data." Fed. R. Evid. 702. A court may properly exclude "'opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'" *Lawes*, 963 F.3d at 98 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Thus, "'trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable.'" *United States v. 33.92356 Acres Of Land*, 585 F.3d 1, 7 (1st Cir. 2009) (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998)).

Here, Jarrell's methodology—evaluating whether the laser system is defective by calculating heat-transfer data—is unreliable at every turn: (1) his methodology is untested; (2) while the error rate is unknown, it is high given numerous flaws; (3) there is no evidence his methodology is generally accepted; and (4) there is a gap between his conclusions and real-world data. Because Jarrell's defect opinions are unreliable, they must be excluded, as his opinions have been in other cases. *See, e.g.*, *Jarrett v. Wright Med. Tech., Inc.*, No. 1:12-CV-00064-SEB-DML, 2021 WL 1165178, at *7 (S.D. Ind. Mar. 26, 2021) ("Because Dr. Jarrell has not used engineering methods to test or examine the specific device that allegedly caused the injuries in this case, his opinions do not pass muster under *Daubert*."); *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 439 (S.D.N.Y. 2016) (excluding Jarrell's defect opinion as not reliable).

### i.     Jarrell's methodology is untested.

Jarrell's calculation methodology is utterly untested. *See Jenks*, No. 09-CV-205-JD, 2012 WL 405479, at *2 (D.N.H. Feb. 8, 2012) (explaining that courts examine "whether the theory or technique can be and has been tested"). Jarrell ran some heat-transfer calculations and called it a day—no testing to determine if his calculations were accurate, applicable to the real world, or meaningful in any manner. He at no point used the GreenLight Laser System to heat any liquid.

While testing is not an absolute requirement for expert testimony, it "is certainly one of the most common and useful reliability guideposts for a district court when contemplating proposed Rule 702 evidence." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 815 (7th Cir. 2012). This is because "the object of *Daubert* is to make certain" that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *In re Dial Complete Mktg. & Sales Pracs. Litig.*, 320 F.R.D. 326, 331 (D.N.H. 2017). And outside the courtroom, design professionals test their theoretical calculations. *See Nease v. Ford Motor Co.*,

6

848 F.3d 219, 232 (4th Cir. 2017) (excluding opinion because the expert's "failure to test his hypothesis renders his opinions" unreliable—"scientific methodology involves generating hypotheses and testing them to see if they can be falsified" and this expert "presented a hypothesis only" (cleaned up)); *Cummins v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir. 1996) (excluding opinion for the lack of testing because they must adhere to the standards of their profession). Though his analyses suffer many flaws, his failure to test is reason enough to exclude his defect opinion.

### ii.   Jarrell's methodology's error rate must be high given the numerous mistakes and flaws in his calculations.

Jarrell's methodology—performing calculations to determine the laser system is theoretically capable of heating saline to 51.85–52.35°C under non-vaporizing conditions— necessarily has a high error rate given his demonstrably flawed calculations. *See Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 32 (1st Cir. 2012) (explaining that error rate is relevant to reliability).

*First*, Jarrell's calculations rest on a false assumption that "all the laser energy was converted to heat" that was transferred from non-vaporized tissue to the saline. (Ex. E, Jarrell Rep. 22.) But as explained by Dr. Lau (and confirmed by common sense), this is impossible:

> Additionally, per laws of thermodynamics, the laser-heated tissue can transfer only a fraction (and not all as assumed by Dr. Jarrell) of its absorbed laser energy to heat the saline solution. In general, a hot object (heated tissue) surrounded by a cold liquid cannot turn into a cold object surrounded by hot liquid. A familiar analogy would be pouring cold liquid into a hot cup: the cold liquid would not become hot instantaneously and turn the cup cold. Such 100% transfer of energy is fundamentally impossible but is implicitly assumed to take place by Dr. Jarrell (i.e., he assumes that all laser energy is fully converted to heating of the saline and ignores heat transferred to the tissue).

(*See* Ex. G, Lau Rep. 19.) A hot object (e.g., non-vaporizing tissue) surrounded by colder liquid (e.g., saline) does not result in a cold object and hot liquid—what Jarrell proposes. There is no such 100% transfer of energy; the warm object transfers a fraction of its energy to the liquid.

7

*Second*, Jarrell's calculations are flawed because he fails to account reliably for the fact that saline flowing out of the bladder during the procedure would mitigate any theoretical heat transfer. Jarrell acknowledges the issue and took a stab at adjusting for it. His initial saline-temperature calculation was 54.35 degrees, but he recognized he needed to subtract to reflect the saline outflow. (Ex. E, Jarrell Rep. 22–23; Ex. D, Jarrell Dep. 111:7-112:23 (noting that in his calculations, "we begin to add in what the impact of flow out of the bladder would be to kind of give us a range that the exact number would fall within" and "[s]o I start with assuming no flow out. I think it's more reasonable to go to the scientific literature which demonstrates that you do get flow out of the bladder and there's empirical data that shows you how much flow you get out and to add that into calculations to get a more accurate range of temperatures").) The number he used to subtract (2–2.5 degrees) is incorrect. He borrowed the number from Stauffer et al., *Overview of bladder heating technology: matching capabilities with clinical requirements*, International Journal of Hyperthermia (2016) (Ex. H), but this article is inapplicable. The *Stauffer* article examined different devices and techniques used for heating cancerous cells in the bladder, and focused on the heat loss from a chemotherapy solution between its warming chamber and the bladder. (*Id.* at 1.) In other words, it focused on the heat flow out of a solution *before* it reaches the bladder, which is not the scenario Jarrell's calculations are intended to address. Thus, while Jarrell concedes his methodology requires that he account for heat loss from saline outflow, he lacks a reliable methodology for doing so.[2]

---

[2] Dr. Jarrell's report is full of examples of *ipse dixit* opinions without any source. For example, upon calculating a saline temperature of 51–52 degrees (after subtracting 2–2.5 degrees), Dr. Jarrell asserted that at 51 degrees, "it takes approximately 4 minutes to cause 2nd or 3rd degree burns of human dermis." (Ex. E, Jarrell Rep. at 22-23.) But there is no reliable basis for this statement. Dr. Jarrell's only citation is to Rivara et al., *Injury Prevention*, New England Journal of Medicine (1997) (Ex. I). But the *Rivara* articles does not state anything of about the time it takes to cause burn injures for 51-52 degrees.

### iii.    Jarrell's methodology is not a generally accepted.

Jarrell failed to examine any of the benefits or utilities of the GreenLight Laser System—he did not account for design trade-offs for his design-defect opinion. During his deposition, Jarrell was asked multiple times if he considered the benefits or utility of the GreenLight Laser System for his analysis on whether the product was unreasonably dangerous or defective. (Ex. D, Jarrell Dep. 161:6–165:18.) His answers made clear he did not. He could not articulate how he factored in the benefits or the utility. (*Id.*) Nor could he list any utility he considered. (*Id.*) In conclusory fashion, he stated he did consider the benefits, but could not explain how.

This is a red flag of unreliability because considering a design's benefits or utilities is a hallmark of generally accepted design evaluation. *See Lawes*, 963 F.3d at 98 (explaining that a key *Daubert* consideration is whether an expert's technique is generally accepted); *See Rypkema v. Time Mfg. Co.,* 263 F. Supp. 2d 687, 693 (S.D.N.Y.2003) ("[T]o advance a reliable hypothesis, an expert is required to ascertain feasibility, to test alternative designs, and to address the engineering factors and tradeoffs that go into the design of a product for distribution in the marketplace."). Jarrell's methodology of ignoring a design's benefits when forming his design opinion is not accepted.

Not factoring in a design's benefits is also contrary to New Hampshire law. *See Vautour v. Body Masters Sports Indus., Inc.*, 147 N.H. 150, 154, 784 A.2d 1178, 1182 (2001) (explaining New Hampshire uses the risk-utility test to determine if a design is defective, and this test centers on "whether the risks outweigh the benefits of the product design"); *see also Bartlett v. Mut. Pharm. Co.*, No. 08-CV-358-JL, 2010 WL 3092649, at *7 (D.N.H. Aug. 2, 2010) (stating "implicit" in every design-defect case is the plaintiff's burden to "prove that the product's risks outweigh its benefits"); *see also Romero v. ITW Food Equip. Grp., LLC*, 987 F. Supp. 2d 93, 106

(D.D.C. 2013) (excluding design-defect opinion because benefits/utility were not considered in jurisdiction where benefit must be considered).

**iv.    There is a yawning gap between Jarrell's conclusions and real-world data.**

Beyond Jarrell's flawed calculations, his conclusions have no support anywhere and are contrary to all existing data. Jarrell's opinion that the laser system could increase saline temperature to the extent it causes thermal injuries is unfounded. Jarrell could not point to any literature describing injuries like Plaintiff's arising from a GreenLight procedure. (Ex. D, Jarrell Dep. 151:22–152:7.) Jarrell could not name a urologist agreed with his opinion. (*Id.* at 152:8–153:7.) Jarrell could not point to any example of an individual experiencing injuries like Plaintiff's from a laser system. (*Id.* at 195:12–196:13.) In fact, Plaintiff's expert urologic surgeon, Dr. Bernstein, who has performed hundreds of GreenLight procedures, has never encountered injuries like Plaintiff's or heard his colleagues describe such injuries. (Ex. J, Bernstein Dep. 14:1–13.)

Given Jarrell's lack of any testing, numerous errors in his calculations, and his unacceptable methodology, this Court should take notice of this glaring analytical gap between Jarrell's conclusion and the real world.

## II.    Jarrell's opinion that a design defect caused Plaintiff's injuries is inadmissible.

Even if Jarrell's opinion that the GreenLight Laser System was defectively designed was admissible (it is not), Jarrell is unqualified to testify whether such a defect is the medical cause of Plaintiff's injuries, and his medical-causation opinion is unreliable.

### A.  Jarrell is patently unqualified to opine on *what* caused Plaintiff's injuries.

Opining that the GreenLight Laser System was defective is one opinion, but opining that this defect *caused* Plaintiff's injuries—rather than a variety of other possible causes—is entirely different. It is a medical-causation opinion that is beyond Jarrell's expertise. Jarrell is not a

10

clinician. (Ed. D, Jarrell Dep. 136:13-17.) He does not have a medical degree and does not diagnose patients. (*Id.*, *Id.* at 212:7–9.) He does not have any specific training regarding urologic surgery. (*Id.* at 218:18-21.) Jarrell is an engineer, but his causation opinion—according to Plaintiff's own medical expert—is within a medical professional's expertise, not an engineer's. (*See* Ex. J, Bernstein Dep. 34:1–16.). In other words, Jarrell's expertise as an engineer does "not qualify him to testify about the cause of [Plaintiff]'s specific injuries". *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 305 (6th Cir. 1997) (excluding engineer's causation opinion because he lacked medical qualifications); *see also Kelly v. McHaddon*, No. CIV.A.98C-12-176-JRS, 2001 WL 209858, at *2 (Del. Super. Ct. Jan. 24, 2001) (excluding engineer's causation opinion because it is "a simple irrefutable fact" that "engineers are not doctors").

Unsurprisingly, courts applying *Daubert* have held engineers cannot opine on what caused a plaintiff's injuries—it is a medical opinion beyond their realm of expertise. *See, e.g.*, *Seals v. Wright Med. Techs., Inc.*, No. 4:20-CV-01656-SRC, 2022 WL 6096818, at *9 (E.D. Mo. Oct. 7, 2022) (excluding engineer's opinions on medical causation); *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19MD2885, 2021 WL 2028682, at *3 (N.D. Fla. May 11, 2021) (same); *Bayes v. Biomet, Inc.*, No. 4:13-CV-00800-SRC, 2020 WL 5594059, at *6 (E.D. Mo. Sept. 18, 2020) (same); *Utz v. Howmedica Osteonics Corp.*, No. 1:06 CV 1963, 2009 WL 5409046, at *4 (N.D. Ohio Mar. 31, 2009) (same).

In sum, this Court should exclude Jarrell's causation opinion as that is an opinion "that is better left to the medical doctors." *Saacks v. Privilege Underwriters Reciprocal Exch.*, No. CV 16-1149, 2017 WL 3867761, at *2 (E.D. La. Feb. 2, 2017).[3]

---

[3] This is not the first time Dr. Jarrell has attempted to take a defect opinion and improperly expand it to a causation opinion. *See Dodson v. Ford Motor Co.*, No. C.A. PC 96-1331, 2006 WL 2405868, at *18 (R.I. Super. Aug. 17, 2006) (admitting limited testimony on defect but excluding testimony on causation).

11

## B. Jarrell's causation opinion is unreliable.

Beyond Jarrell's lack of qualifications to opine on medical causation—or perhaps, *because* of these lack of qualifications—his methodology to reach his causation opinion is unreliable. He claims to have considered other possible causes of Plaintiff's injuries and to have ruled them out. (Ex. D, Jarrell Dep. 136:2–12.) This process is referred to as a differential etiology, and when properly performed, the "doctor rules in all the potential causes of a patient's ailment and then by systematically ruling out causes that would not apply to the patient, the physician arrives at what is likely the cause of the ailment." *Myers v. Ill. Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). To be reliable as a methodology for determining causation, the expert "must show that the steps taken as part of that analysis—the 'ruling out' and the 'ruling in' of causes—were accomplished utilizing scientifically valid methods." *Id.* (cleaned up). Thus, flawed methods to rule in or rule out possible causes renders a causation unreliable. *See, e.g.*, *Milward v. Rust-Oleum Corp.*, 820 F.3d 469, 476 (1st Cir. 2016) (affirming exclusion of causation opinion where expert unreliably ruled in possible cause while ruling out a different possible cause in conclusory fashion).

Here, Jarrell: (1) flatly did not consider the saline being overheated by a blanket warmer; and (2) his methodology to rule out the possibility that the bladder was damaged by the heat of the bipolar loop during the TURP procedure was demonstrably unreliable.

### i. Excessively pre-heated saline

Jarrell did not consider excessively pre-heated saline (that the irrigation fluid used during the procedure was overheated prior to the procedure) as a possible cause. This should decisively establish unreliability, as Plaintiff's surgeon, Dr. Lamba, testified that a possible cause was staff storing the saline in the wrong heating chamber prior to surgery. (Ex. B, Lamba Dep. 145:3–21.) Indeed, Dr. Lamba testified that, at some point after Plaintiff's surgery, she saw surgical staff

12

improperly removing saline from a blanket warmer set to 140 degrees rather than the fluid-warming compartment, which is set to approximately 100 degrees. (*Id.* at 141:20–143:3.)

Jarrell did not address this possibility in his report. When asked at his deposition why he did not consider overheated saline as a possible cause, Jarrell pivoted and stated he did consider it and believes it unlikely. (Ex. D, Jarrell Dep. 138:11–139:7.) But when asked to explain his reasoning, he stated in conclusory fashion that nothing suggested it was probable, but conceded he did not know as he "wasn't there." (*Id.* at 139:8–140:13.) Pushed further, he admitted he did not rule it out, and it was "possible." (*Id.* at 140:15–16.)

Jarrell's bottom-line conclusion that overheated saline is an unlikely cause does not reflect a medically or scientifically sound process for ruling out a cause that Plaintiff's own surgeon believes cannot be ruled out. Even ***Plaintiff's own medical expert*** Dr. Bernstein, who has used the GreenLight Laser System hundreds of times and considers it a safe and effective device, stated it was his "belief—to a reasonable degree of medical certainty—that the cause of Plaintiff's injury will remain unexplained from a medical standpoint." (Ex. K, Bernstein Rep. 3.) Dr. Bernstein further testified the cause of Plaintiff's injury was unknown and he could not determine the laser system was the cause of Plaintiff's injury. (Ex. J, Bernstein Dep. 26:5–14.) If none of Plaintiff's treaters or Plaintiff's own medical expert could conclude the GreenLight Laser System caused Plaintiff's injuries, how can Plaintiff's engineer reliably reach this conclusion? He cannot.

### ii.   Heat from the bipolar loop during the TURP procedure

Dr. Lamba finished Plaintiff's surgery by performing a transurethral resection of the prostate ("TURP")—where she removed tissue using a bipolar loop (an instrument that has electrodes at the end of it to resect tissue). Jarrell claims to have ruled out the possibility the bladder was damaged by the heat of the bipolar loop. But his unreliable analysis shows otherwise.

Jarrell did not know basic information about the TURP procedure, rendering any opinion on it little more than results-driven conjecture. He did not know the temperature of the bipolar loop, yet somehow concluded it was not the cause of the injuries. (Ex. D, Jarrell Dep. 144:22–145:11.) He performed no calculations to assess how the bipolar loop could impact the temperature of the saline. (*Id.* at 145:24–146:4.) He admits he does not know if saline temperature can increase during a bipolar TURP procedure. (*Id.* at 147:18–21.) While he knew the bipolar loop produces heat, he did not know how much heat as he "didn't have all the information available." (*Id.* at 241:13–24.) As he knows almost nothing about the TURP procedure, he cannot possibly rule it out as a cause with anything approaching the reliability *Daubert* requires.

In sum, Jarrell's inability to scientifically and reliably rule in and rule out all possible causes of Plaintiff's injuries is fatal to his causation opinion and renders it unreliable and speculative. This is not the first time Jarrell has offered conclusory causation opinions, and this Court should follow suit and exclude his opinion. *See Ramkelawan v. Globus Med. Inc.*, No. 5:18-CV-100-OC-30PRL, 2019 WL 8267231, at *9 (M.D. Fla. Dec. 10, 2019) (excluding Jarrell's causation opinion because it lacked any reliable methodology and was "*ipse dixit*").

## III.    Jarrell's warning-defect opinions are inadmissible.

Jarrell's warnings opinions are derivative of his design-defect opinions and fail for the same reasons the design opinions fail. Independently, however, Jarrell lacks qualifications to opine on warnings for laser systems, and his causation opinion lacks foundational reliability.

### A.  Jarrell is unqualified to opine on laser-system warnings.

Jarrell has no basis in education or training to testify about warnings for laser systems. He has never drafted warnings for a laser system. (Ex. D, Jarrell Dep. 160:10–15.) He has never been on the receiving end of warnings in the healthcare-provider capacity. (*Id.* at 160:16–22.) And he has no experience with laser systems. (*Id.* at 214:8–220:1) Simply put, he is unqualified. *See*

14

*Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1329 (M.D. Fla. 2015) ("Hyman's lack of medical training *or* expertise in the relevant medical specialty renders him further unqualified to offer an opinion on the adequacy or appropriateness of the G2 filter's warning label.").

### B.  Jarrell's warning opinion is unsupported speculation.

Even if Jarrell was qualified to opine on the existence of an inadequate warning, he cannot testify that any such inadequacy caused Plaintiff's injuries. This is because an expert's opinion must be "based on sufficient facts or data." Fed. R. Evid. 702(b); *see also In re Dial Complete Mktg. & Sales Pracs. Litig.*, 320 F.R.D. 326, 331 (D.N.H. 2017). Here, Jarrell's opinion is baseless speculation because there is *nothing* in the record to indicate a change in warning would have been read by Plaintiff's surgeon. Jarrell concedes that for any change in warning to be helpful, whoever operated the GreenLight Laser System prior to Plaintiff's surgery would have had to read it. (Ex. D, Jarrell Dep. 82:5–83:6.) But the record is unmistakably clear: Plaintiff's surgeon has *never* reviewed the GreenLight XPS laser console's operator's manual or the MoXy fiber's Directions For Use. (Ex. B, Lamba Dep. 133:8–10, 152:16–20.) Thus, any opinion that a change in the warning's language would have mattered in any manner, is speculation and must be excluded. *See, e.g.*, *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1084 (8th Cir. 1999) (affirming exclusion of warnings expert where there was no evidence the warnings were read by the relevant user).[4]

### Conclusion

Because Jarrell possesses no qualifications relating to laser systems and his opinions lack reliable methodology, Boston Scientific respectfully requests this Court exclude his opinions.

---

[4] To the extent the Court excludes Jarrell's opinion that an inadequate warning caused Plaintiff's injury, any warning opinion from Jarrell (such as the existence of an inadequacy) must be similarly excluded. This is because without being able to offer causation testimony on the warning, Plaintiff has no evidence of causation for its warnings claims and the claim cannot prevail. Thus, any remaining opinion from Jarrell on warnings would be irrelevant and unhelpful to the jury. *See Schlis v. Target Corp.*, No. 19-CV-1201-JD, 2021 WL 2590199, at *4 (D.N.H. June 24, 2021) (stating that unhelpful testimony should be excluded because to "testify as an expert, a witness must provide knowledge that will 'help the trier of fact to understand the evidence or to determine a fact in issue.'").

Dated: March 8, 2023

Respectfully submitted,

*/s/ Barry J. Koopmann*
Alana K. Bassin (Admitted *Pro Hac Vice*)
Barry J. Koopmann (Admitted *Pro Hac Vice*)
NELSON MULLINS RILEY & SCARBOROUGH LLP
1600 Utica Ave. South, Suite 750
Minneapolis, MN 55416
Telephone:    (612) 464-4500
Facsimile:    (612) 255-0739
Email: Alana.Bassin@nelsonmullins.com
          Barry.Koopmann@nelsonmullins.com

Michael J. Carroll
Tara E. Lynch
GORDON & REES SCULLY MANSUKHANI, LLP
699 Walnut Street, 4th Floor
Des Moines, IA 50309
Telephone: (515) 204-2845
Facsimile: (515) 466-2710
Email: mcarroll@grsm.com
          tlynch@grsm.com

**Attorneys for Boston Scientific Corporation**

## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2023, a true and correct copy of the foregoing was filed

via the Court's CM/ECF Electronic Filing service which served notice of such filing on all counsel

of record in this case.

*/s/ Barry J. Koopmann*
Barry J. Koopmann

16