# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**Carl Alexander Cohen,**

v.

Case No. 1:20-cv-00943-PB
Opinion No. 2024 DNH 028

**Boston Scientific Corporation, et al.**

## MEMORANDUM AND ORDER

The plaintiff, Alex Cohen, underwent laser surgery for an enlarged prostate that resulted in diffuse thermal burns to his bladder. He has brought a products liability action against Boston Scientific Corporation, the manufacturer of the laser, and Republic Surgical Incorporated, the company who provided a central component of the laser for use in the surgery and a medical technician who operated the component during the surgery. Both defendants have filed motions for summary judgment (Doc. 71 and Doc. 72).

## I.     BACKGROUND

### A.     The GreenLight XPS Laser System

Boston Scientific manufactures the GreenLight XPS Laser System, a medical device used in various surgeries to vaporize and coagulate tissues. Doc. 69-2 at 16. The device consists of two components: a console, which generates a green laser light, and a fiber, which transmits the laser light from the console to the targeted tissue in a patient's body. Id. The laser light

is absorbed by the red blood cells in the targeted tissue, which generates heat and causes the cells to burst, thereby vaporizing the tissue. Id. at 17.

One type of surgery the GreenLight device can be used for is photoselective vaporization of the prostate (PVP). Id. at 17, 24. This procedure is used to treat benign prostatic hyperplasia (BPH), id., a condition in which a patient's prostate gland becomes enlarged and squeezes the urethra, Doc. 82-11 at 4. During a PVP procedure, a laser technician operates the console, turning it on and placing it on standby mode while the surgeon prepares for surgery. Doc. 71-3 at 28-29. The surgeon has a bag of saline solution connected to the laser fiber and adjusts the flow until she and the laser technician are "happy with the drip rate." Id. at 27. This saline, which Boston Scientific notes should be at room temperature, Doc. 82-3 at 30, "runs through the fiber" throughout the surgery and "aids with cooling" the fiber, Doc. 71-3 at 26. The fiber is then inserted into the surgeon's resectoscope, a surgical instrument that also includes a camera device as well as a tube for a second, separate supply of saline solution. Id. at 24, 27; Doc. 71 at 4. The surgeon inserts the resectoscope into the patient's bladder via the urethra. Doc. 75 at 1. When she is ready to begin the procedure, she instructs the laser technician to switch the device off standby mode. Doc. 71-3 at 28. At this point, the surgeon controls the laser by using a foot switch, which includes

pedals to initiate coagulation, vaporization, or standby modes. Id.; Doc. 69-2 at 45.

Throughout the procedure, the surgeon uses the irrigation tube attached to her resectoscope to "constantly" deliver saline fluid to the surgical area, controlling the flow using a valve on the resectoscope. Doc. 71-3 at 23, 25. This irrigation helps the surgeon visualize the surgical field by moving tissues out of the way and flushing away blood and other debris. Id. at 23. The GreenLight device does not specify the temperature to which this irrigation fluid should be heated, and surgeons have varying preferences, electing to use saline heated to either room temperature (approximately 68°F or 20°C) or just above physiological temperature (around 104°F or 40°C). See id. at 19; Doc. 71-8 at 17. As the saline circulates through the patient's urinary system and is replaced by new irrigant, it is then drained out via a catheter. Doc. 71-3 at 23; Doc. 75 at 2.

## B.   Cohen's Surgery and the Aftermath

In 2016, Cohen saw Dr. Shilpa Lamba, M.D., a board-certified urologist at Manchester Urology Associates in Dover, New Hampshire, complaining of "lower urinary tract symptoms." Doc. 71-3 at 5-7. She diagnosed him with BPH and, after a year of trying various medications to no avail, recommended surgical intervention. Id. at 7-8. She presented Cohen with two

options: PVP or transurethral resection of the prostate (TURP).[1] Id. at 8-9.
Cohen elected PVP, and Dr. Lamba performed the procedure in July 2017, at
Wentworth-Douglass Hospital (WDH) in Dover, New Hampshire using the
GreenLight device. Doc. 11 at 10; Doc. 75 at 2.

WDH purchased the GreenLight fiber directly from Boston Scientific.
Doc. 72-3 at 2. Republic Surgical provided the console, which it had previously
purchased from Boston Scientific. Doc. 72-7 at 2. Republic Surgical charged
WDH a "[r]ental" fee to use the device, Doc. 81-2; however, Republic Surgical
owned the device at all relevant times, see Doc. 72-7 at 2-3. Republic Surgical
also arranged for a laser technician to operate the console throughout Cohen's
procedure. Id. at 2-3.

Dr. Lamba used the GreenLight device and irrigation saline solution
heated to approximately 103 or 104°F, Doc. 71-3 at 19; Doc. 71-5 at 6, to
vaporize several sections of enlarged prostate tissue, Doc. 75 at 3. The
surgery proceeded as normal until Dr. Lamba encountered an eight-to-ten-
millimeter nodule at the apex of the prostate that would not vaporize. Doc. 75
at 3. In her attempt to remove this nodule, she "passed the laser fiber
between the nodule and the capsular wall and initiated laser vaporization,"

---

[1]    In contrast to PVP, which uses the GreenLight device to vaporize
tissue, TURP uses a surgical instrument containing electrodes—either a
monopolar loop or a bipolar loop—to resect unwanted tissue. Doc. 69 at 3;
Doc. 82-2 at 88.

but the metal cap at the end of the fiber broke off. Id. At this point, one of the device's "automatic safety mechanism[s]" activated, and the device switched back to standby mode.[2] Doc. 71-3 at 29. Dr. Lamba was able to safely retrieve the fiber's cap from Cohen's body but decided to abandon the PVP procedure, switching to the TURP technique and successfully excising the nodule using a bipolar loop. Doc. 75 at 3.

Towards the end of the surgery, Dr. Lamba inspected the surgical area for bleeding and evidence of laser vaporization, which has an immediate, visible effect on the tissue. Id.; Doc. 71 at 5. She documented in her surgical notes that the ureteral orifices were "away from any vaporization or resection." Doc. 75 at 3. She then removed her resectoscope and irrigated the bladder. Id. All in all, she recorded that Cohen "tolerated the procedure well with no complications." Id.

But a few days after his surgery, Cohen began reporting adverse symptoms, including general feelings of malaise and incontinence, which persisted over the next several months. Doc. 11 at 10; Doc. 71-3 at 11-12. In

---

[2]     This mechanism, known as FiberLife, "continuously monitors the temperature of the tip of the fiber and momentarily stops the laser emission when the fiber gets too hot." Doc. 69-2 at 16. It is activated if "tissue or vapor bubbles accumulate on the tip [of the fiber], or if for other reasons there is damage due to excessive heating of the fiber." Id. In "most cases," the laser will "turn back on immediately and the procedure continues without interruption"; but if FiberLife is "activated continuously," the console "will automatically detect this condition, [and] put the laser in Standby mode." Id.

October 2017, Dr. Lamba's colleague, Dr. Cormac O'Neill, M.D., performed a cystoscopy to examine Cohen's urinary system. Doc. 75-1 at 2-3. He could not locate the ureteral orifices, and he observed thermal injuries throughout the bladder area. Id. at 2-3 (documenting "significant thermal effect in the prostatic fossa" and "significant exudative changes consistent with a thermal injury to the bladder"). He subsequently diagnosed Cohen with "[s]evere thermal cystitis." Id. at 2. Consequently, Cohen underwent extensive reconstructive surgery, has a permanent urostomy bag, and is in constant pain. Doc. 11 at 2, 11. He is also permanently incontinent and impotent. Id.

## C.   Cohen's Lawsuit

Cohen filed suit in state court in July 2020, and the case was removed to this court on diversity grounds. Doc. 1. He alleges that the GreenLight device has design and warning defects and has sued Boston Scientific for strict products liability, breach of the implied warranty of merchantability, and violation of New Hampshire's Consumer Protect Act (CPA). Doc. 11 at 11-22. He also brings strict products liability and breach of the implied warranty of merchantability claims against Republic Surgical as the provider of the GreenLight console.[3] Id. at 25-39.

_____

[3]   Cohen originally asserted additional claims for a manufacturing defect, negligence, breach of an express warranty, and breach of the implied warranty of fitness for a particular purpose against Boston Scientific and

Cohen's theory of the GreenLight defect is based on the opinion of his engineering expert, Dr. John Jarrell, Ph.D. Dr. Jarrell opines that the GreenLight Laser System is defective because, during periods of non-vaporization, the device has the power output capacity to overheat the tissues, which can then, in turn, "cause transient increases in the temperature" of the irrigation saline to levels that "can cause burns." Doc. 82-3 at 6; accord Doc. 82-4 at 4. He also notes that alternative technologies—such as using a similar laser in combination with a thermocouple or temperature-sensing catheter—were available to "monitor the temperature of the saline fluid" and "alert[] the surgical personnel of unsafe temperatures within the bladder," and he insists that Boston Scientific "failed to adequately warn or specify the temperature to be used for the irrigation saline." Doc. 82-3 at 7-8.

The defendants contest Cohen's theory of the defect and move for summary judgment on all of Cohen's remaining claims against them.

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is warranted when the record shows "no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

Republic Surgical, as well as a CPA claim against Republic Surgical. Doc. 11 at 11-22, 25-39. However, Cohen has since abandoned those claims. Doc. 82 at 41; Doc. 98 at 147; see Doc. 81 at 4.

matter of law." Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016). A "material fact" is one that has the "potential to affect the outcome of the suit." Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). A "genuine dispute" exists if a factfinder could resolve the disputed fact in the nonmovant's favor. Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018).

The movant bears the initial burden of presenting evidence that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); accord Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018). Once the movant has properly presented such evidence, the burden shifts to the nonmovant to designate "specific facts showing that there is a genuine issue for trial," Celotex, 477 U.S. at 324, and to "demonstrate that a trier of fact could reasonably resolve that issue in [its] favor," Irobe, 890 F.3d at 377 (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)). If the nonmovant fails to adduce such evidence, the motion must be granted. Celotex, 477 U.S. at 324. In considering the evidence, the court must draw all reasonable inferences in the nonmoving party's favor. Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).

### III.   ANALYSIS

Boston Scientific moves for summary judgment, arguing that it is not strictly liable for Cohen's injuries and did not breach the implied warranty of merchantability or violate the CPA. Doc. 71. Republic Surgical joins Boston Scientific's motion, and also moves for summary judgment on independent grounds. Doc. 72. I begin by addressing Boston Scientific's motion and then turn to Republic Surgical's separate grounds for relief.

### A.   **Boston Scientific's Motion for Summary Judgment**

#### 1.   Design Defect

Boston Scientific contends that it is entitled to summary judgment on Cohen's design defect claim because the GreenLight device is "unavoidably unsafe and accompanied by proper warnings" and therefore falls within an exception to the general doctrine of strict liability.[4] Doc. 71 at 11-12. Cohen objects, asserting that such an exception to strict liability only extends to "experimental drug[]s or vaccine[s]." Doc. 82 at 38. Cohen further argues that, regardless, the device is neither unavoidably safe given the feasibility of

---

[4]      Boston Scientific also argues that it is entitled to summary judgment because Cohen's engineering expert's testimony must be excluded pursuant to Federal Rule of Evidence 702, and Cohen cannot prove several essential elements of his claims without that testimony. Doc. 71 at 8-11. Because I have denied the defendants' motions to exclude the engineering expert's testimony without prejudice, Doc. 102, I also deny Boston Scientific's motion for summary judgment on this basis without prejudice.

safer designs—such as adding a thermocouple to the fiber—nor accompanied by proper warnings. Id. at 38-39.

The New Hampshire Supreme Court has adopted section 402A of the Restatement (Second) of Torts, which sets forth the tort of strict liability. Buckingham v. R.J. Reynolds Tobacco Co., 142 N.H. 822, 825 (1998). This section subjects "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer . . . to liability for physical harm thereby caused." Restatement (Second) of Torts § 402A (Am. L. Inst. 1965); accord Tersigni v. Wyeth, 817 F.3d 364, 367 (1st Cir. 2016). But comment k provides an exception for "[u]navoidably unsafe products" so long as the product is "properly prepared" and "accompanied by proper directions and warning." Restatement (Second) of Torts § 402A cmt. k (Am. L. Inst. 1965). It states, in relevant part:

> There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. . . . Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. . . . The seller of such products . . . is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

Id. (emphasis in original).

As an initial matter, I disagree with Cohen that comment k is expressly limited to drugs and vaccines. Though the comment cites "drugs, vaccines, and the like" as "especially common" examples of products falling within its scope, comment k makes clear that it applies more generally to "products" that are "quite incapable of being made safe for their intended and ordinary use." Id. This could reasonably include certain medical devices that, though "useful and desirable" for the treatment of certain conditions, are nonetheless "attended with a known but apparently reasonable risk." Id.

I disagree, however, with Boston Scientific that a reasonable jury could only conclude that the GreenLight device falls within the purview of comment k. Comment k "suggests a balancing." Brochu v. Ortho Pharm. Corp., 642 F.2d 652, 657 (1st Cir. 1981). "If the danger is unnecessary, the product, regardless of its utility, is defective." Id. In contrast, if "the danger is unavoidable and the utility is great, liability may be avoided with proper warnings." Id.; Mutual Pharm. Co., Inc. v. Bartlett, 570 U.S 472, 505 (2013) (Sotomayor, J., dissenting) (explaining that a defendant seeking to invoke comment k as an affirmative defense must demonstrate that "the product is highly useful and that the danger imposed by the product could not have been avoided through a feasible alternative design"). And for the purposes of summary judgment, Boston Scientific has not met this burden.

11

Boston Scientific argues that because the GreenLight device is "designed to vaporize human tissue through its 'generation of heat which bursts cells'" and it "informs the user of this," it is shielded from liability under comment k. Doc. 71 at 11-12. But this is not the proper inquiry. Instead, Boston Scientific must demonstrate that, even in light of alternative designs, the risk of overheated saline was unavoidable and that the device's overall benefit to patients outweighs that risk.

Cohen has produced expert engineering testimony in support of his claims that the inherent risks presented by the GreenLight device could be prevented, or substantially mitigated, by adding a thermocouple or temperature-sensing catheter to the fiber or specifying the temperature to which the irrigation saline should be heated prior to surgery. Boston Scientific has not offered any reasons as to why these alternatives are not feasible or would otherwise fail to mitigate the risk. Thus, a jury could reasonably credit the expert's opinion on this part and conclude that the risk of overheated saline could have been avoided through a feasible alternative design. Accordingly, Boston Scientific is not entitled to summary judgment on this ground.

2.   Failure to Warn

Boston Scientific next seeks summary judgment on Cohen's failure to warn claim. First, the company argues that it did not have a duty to warn of

diffuse thermal injuries from overheated saline because the company was not aware and could not reasonably have become aware of the risk that the GreenLight device could cause injuries of the type that Cohen suffered. Doc. 71 at 13-15. Second, Boston Scientific contends that Cohen's injuries were not caused by any such warning defect because Dr. Lamba did not read the device's instruction manual or directions, and thus, a warning would not have been seen or heeded. Id. at 15-16.

Boston Scientific's arguments invoke the standard for negligent failure to warn, which requires a plaintiff prove that "(1) [the defendant] had a duty to provide certain warnings; (2) [the defendant] failed to provide the required warnings; and (3) [the defendant's] breach of duty caused [the plaintiff's] injuries." Gibson v. Mack Trucks, Inc., 2007 DNH 146, 2007 WL 4245845, at *2 (D.N.H. Nov. 30, 2007). However, at the hearing on the present motions, Cohen stated that he had abandoned his negligence claim. Doc. 98 at 147. Thus, to the extent Boston Scientific is arguing for summary judgment on the negligent failure to warn claim, its argument is now moot.

To the extent Boston Scientific seeks summary judgment on Cohen's strict liability failure to warn claim, its argument is insufficiently developed. A strict liability failure to warn claim goes to whether a product is "unreasonably dangerous." Chellman v. Saab-Scania AB, 138 N.H. 73, 77 (1993). This analysis requires courts to evaluate "many possible factors

including a product's social utility balanced against the risk of danger, the cost and practicality of reducing the risk of danger, and the presence or absence and efficacy of a warning of hidden danger." Id. at 77-78. Accordingly, if the "design of a product makes a warning necessary to avoid an unreasonable risk of harm from a foreseeable use, the lack of warning or an ineffective warning causes the product to be defective and unreasonably dangerous." Id. at 78. Boston Scientific does not advance any argument as to why these standards could not be satisfied in this case, and therefore it has not demonstrated that it is entitled to summary judgment on Cohen's failure to warn claim.

       3.    <u>Breach of Implied Warranty of Merchantability</u>

Boston Scientific also moves for summary judgment on Cohen's claim for breach of the implied warranty of merchantability, stating that such a claim requires sufficient "evidence of an actual defect," which, it argues, Cohen cannot provide. Doc. 71 at 17-18. Specifically, Boston Scientific states that "for the same reasons there is no evidence of a design . . . or warning defect, there is no evidence of any noncompliance with an implied warranty." Id. at 18. As I have explained, however, Boston Scientific has failed to demonstrate that it is entitled to summary judgment on Cohen's strict products liability claims. Thus, those same arguments fail here, and summary judgment on this ground is similarly denied.

4.    <u>Violation of CPA</u>

Lastly, Boston Scientific moves for summary judgment on Cohen's CPA claim. The CPA prohibits "any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." N.H. Rev. Stat. Ann. § 358-A:2. It also provides a non-exhaustive list of prohibited conduct, including "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," id. § 358-A:2(V), and "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," id. § 358-A:2(VII).

Invoking these two provisions, Cohen alleges that Boston Scientific engaged in "deceptive business practices" by (1) misrepresenting GreenLight's "characteristics, uses, benefits, and qualities"; (2) misrepresenting GreenLight's "standard, quality, and grade"; and (3) failing to disclose information concerning the GreenLight device "with the intent to induce hospitals and physicians" and, by extension, patients to use its products. Doc. 11 at 22-23. In its motion for summary judgment, Boston Scientific argues that Cohen has failed to establish that it engaged in any intentional or reckless wrongdoing. Doc. 71 at 19-20. Cohen responds that it is for the jury to decide whether Boston Scientific's conduct was reckless. Doc. 82 at 40-41. He explains that his engineering expert will testify that Boston

Scientific failed to conduct a proper risk assessment or failure analysis, which would have revealed the risk of overheated saline. Id. Thus, he contends that there is a genuine issue of fact as to whether Boston Scientific acted with reckless disregard for the truth of its representations. Id. I agree with Boston Scientific that Cohen has failed to identify sufficient supporting evidence to sustain this claim.

To bring a successful claim under sections V or VII of the CPA, a plaintiff "must establish that the defendant 'made a representation, with actual knowledge of its falsity or reckless disregard for its truth, with the intent to induce consumers to enter a transaction.'" Guay v. Sig Sauer, Inc., 626 F. Supp. 3d 536, 544 (D.N.H. 2022) (quoting D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc., 561 F. Supp. 3d 114, 122 (D.N.H. 2021)). Furthermore, because the statute prohibits "unfair or deceptive conduct," the New Hampshire Supreme Court has held that the violations enumerated in the statute require "some element of knowledge on the part of the defendant." Id. (quoting Kelton v. Hollis Ranch, LLC, 155 N.H. 666, 668 (2007)); cf. Brace v. Rite Aid Corp., No. 10-cv-290, 2011 WL 635299, at *5 (D.N.H. Feb. 14, 2011) ("[I]t is not a CPA violation to sell bad goods or services; the CPA is implicated only when a seller induces the purchase of such goods through the use of deception."). Accordingly, a defendant is in violation of sections V and VII of the CPA if it: "(1) represents the goods or services are of a particular

standard, quality or grade when they are of another (or have characteristics they do not have), (2) knows the representation is false or has a reckless disregard for its truth, and (3) does so with the intent to induce consumers to buy the product." Guay, 626 F. Supp. 3d at 545.

Here, the only misrepresentations Cohen refers to are general statements regarding the benefits of the GreenLight device—including "shorter" hospital stays and "faster" recoveries. Doc. 11 at 23 (cleaned up). But, even assuming such general statements by Boston Scientific as to the GreenLight device's safety constitute misrepresentations actionable under the CPA, Cohen has failed to cite any evidence to support a finding that that these assertions were made with the requisite scienter.

In particular, Cohen does not provide any evidence that Boston Scientific was, or should have been, aware of the risk of overheated saline prior to his surgery, much less that the company recklessly disregarded such information in an attempt to deceive Cohen or his doctors into using the device. Although Cohen cites some evidence that Boston Scientific may have become aware of some risk of overheating, the evidence is nonetheless insufficient. For example, in his report, Cohen's expert cites a Canadian recall of the GreenLight device indicating the need for "increased irrigation flow [to] increase the liquid cooling effect and . . . reduce temperature related complaints." Doc. 82-3 at 18. However, this recall did not occur until March

2020, nearly three years after Cohen's surgery. Id. Similarly, though one of Cohen's doctors testified to having seen similar injuries resulting from a PVP procedure using a GreenLight device while he was a resident, Doc. 82-5 at 4, there is no evidence that this adverse event was reported to Boston Scientific. Simply put, Cohen's evidence fails to satisfy the standard set forth by the CPA, and Boston Scientific is entitled to summary judgment on this claim.

**B.    Republic Surgical's Motion for Summary Judgment**

At present, two claims remain against Republic Surgical—strict liability and breach of the implied warranty of merchantability. Doc. 81 at 4. Both claims rest on Republic Surgical being "the provider of the defective GreenLight laser console" used in Cohen's surgery, which, Cohen argues, places Republic Surgical in the "same shoes" as Boston Scientific for the purposes of strict liability. Id. at 4, 6.

Republic Surgical moves for summary judgment on both claims on the ground that it did not sell the GreenLight console to WDH for use in Cohen's surgery. Doc. 92 at 3-5. Cohen disagrees and contends that Republic Surgical was, in fact, a seller of the GreenLight console because it was not a medical provider and charged WDH a fee to use the console. Doc. 81 at 4-10. Alternatively, he argues that a "sale" need not be a permanent transfer of property. Id. at 8-9. I agree with Republic Surgical.

18

Section 402A of the Restatement (Second) of Torts explains that "one who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to strict liability for physical harm thereby caused if, inter alia, the seller is engaged in the business of selling such a product." Royer v. Cath. Med. Ctr., 144 N.H. 330, 331 (1999) (cleaned up). Under this doctrine, manufacturers and retailers are often held liable for harms caused by defective products. Bolduc v. Herbert Schneider Corp., 117 N.H. 566, 569 (1977).

However, as Republic Surgical correctly notes, the New Hampshire Supreme Court has often declined to expand this doctrine beyond its "historical limitations." Dudley v. Bus. Express, Inc., 882 F. Supp. 199, 210 (D.N.H. 1994). In particular, "[e]fforts to extend strict liability into the area of services have generally failed." Bolduc, 117 N.H. at 569 (distinguishing between a "manufacturer or seller" of a product, who is subject to strict liability, and a service provider, who is not); Dudley, 882 F. Supp. at 210 (D.N.H. 1994) (dismissing the plaintiff's strict liability and breach of implied warranty claim because the defendant was a "supplier of services rather than a seller of products"); Royer, 144 N.H. at 332 ("If the defendant merely provides a service, however, there is no [strict] liability absent proof of a violation of a legal duty.").

For example, in <u>Bolduc</u>, the plaintiff's child died after falling from a passenger tramway operated by the defendant. 117 N.H. at 567. The New Hampshire Supreme Court declined to find the defendant operator strictly liable on statutory grounds but explained that it "would [have] reach[ed] the same result" even without a controlling statute because the operator was "not the manufacturer or seller of the tramway." Id. at 569. Instead, the court noted that the operator "provide[d] only a service, that is, transportation up the mountain slope." Id.; see also Siciliano v. Capitol City Shows, Inc., 124 N.H. 719, 730 (1984) (declining to hold the defendant owner and operator of an amusement park strictly liable for a defective ride because it "provide[d] persons with a service[,] namely, a ride on a machine," and did "not sell or supply a product"). It further explained that strict liability "has usually been denied" even in cases where "a product is used or supplied in the course of and as an incident to the service." Bolduc, 117 N.H. at 569.

Here, Republic Surgical supplies a service—the use of the GreenLight console and the assistance of the laser technician. There is no evidence that it has sold a GreenLight console or is in engaged in the business of selling GreenLight consoles. As such, it cannot be held liable under New Hampshire's strict liability doctrine.

Cohen disagrees and argues that because Republic Surgical was neither a medical provider nor had any "special relationship" with Cohen, it

cannot have offered a service. Doc. 81 at 6-7. In making this argument, Cohen attempts to distinguish his case from cases like Royer, where the New Hampshire Supreme Court held that a health care provider who "supplie[d] a defective prosthesis in the course of delivering health care services" was not a "seller" of the prosthetic device subject to strict liability but rather a "provide[r] [of] a professional service." 144 N.H. at 332. But Cohen overreads Royer and also ignores other cases, such as Bolduc and Siciliano, which are not limited to the medical context and in no way displaced by Royer.

In Royer, the court held that although the hospital transferred possession of a defective prosthetic to a patient for a fee, thereby arguably constituting a sale, it was nonetheless not "engaged in the business of selling prosthetic devices" such that it could be held strictly liable for the defect. Id. at 335-36. The court explained that unlike normal commercial transactions where the "essence of the transaction between the retail seller and the consumer relates to the article sold," a patient, "does not enter a hospital to 'purchase' a prosthesis, but to obtain a course of treatment in the hope of being cured of what ails him." Id. at 334-35 (cleaned up) (distinguishing the scenario with the defective prosthetic from one in which "a plaintiff purchases a defective tire from a retail tire distributor"). Thus, Royer merely carves out additional protection for hospitals that provide defective products in the course of their treatments, and it is therefore inapplicable to the

21

present case where Republic Surgical never transferred possession of the GreenLight device to Cohen.

Cohen next asserts that Republic Surgical was, in fact, a seller of the GreenLight console because the company charged WDH a fee for using the console. Doc. 81 at 8-9. This, Cohen asserts, renders Republic Surgical a "commercial enterprise" engaged in the business of providing products rather than services. Id.; see also Doc. 81-2 (presenting Republic Surgical's bill for the "[r]ental" of the GreenLight console to WDH). In so arguing, Cohen relies on Newmark v. Gimbel's Inc., 258 A.2d 697, 702 (N.J. 1969), a case in which the New Jersey Supreme Court distinguished between the services rendered by a beautician and those by a medical provider, such as a doctor. There, the court found that the beautician was primarily engaged in a commercial enterprise rather than patient-centered care and thus could be held liable under strict liability for injuries resulting from a salon service. Id. at 702-05.

The New Hampshire Supreme Court, however, has expressly rejected this line of reasoning. The plaintiffs in Siciliano argued that "by supplying amusement rides to the general public," the defendant owner and operator of the ride was "engaged in full-scale commerce" such that strict liability should attach. 124 N.H. at 730. Nonetheless, the court rejected this argument and held that the defendant was not engaged in "sell[ing] or supply[ing] a product" because the passenger was merely a licensee "with no property

22

rights in the ride." Id. Accordingly, the fact that Republic Surgical charged WDH a fee to use the GreenLight console with no associated transfer of property rights does not transform its provision of a service into the sale of a product.

Lastly, Cohen asserts that "the law makes clear that a 'sale' in the sense that the product is provided to a customer forever is not required to impose strict liability on the provider of such product." Doc. 81 at 8. The only sources of support he cites for this proposition, however, is Perfection Paint & Color Co. v. Konduris, 258 N.E.2d 681 (Ind. App. 1970) and Newmark. But not only are these cases not binding on this court, but such a rule would broaden the scope of strict liability under New Hampshire law, which the state's courts have been loath to do. See Dudley, 882 F. Supp. at 210.

Because Republic Surgical only supplied a service, it cannot be held liable under New Hampshire's strict liability doctrine. Additionally, as the New Hampshire Supreme Court has explained, in cases "involv[ing] a nearly pure service transaction," a plaintiff's claim for a breach of implied warranty is likewise "inappropriate." Bolduc, 117 N.H. at 569. Thus, Republic Surgical is entitled to summary judgment on both the strict liability and breach of implied warranty claims.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Boston Scientific's motion (Doc. 71) is denied in part and granted in part, and Republic Surgical's motion (Doc. 72) is granted. Republic Surgical is hereby dismissed from the case.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

March 26, 2024

cc:    Counsel of Record